**C. Walter CULKIN, Appellant,**

v.

**NEIMAN–MARCUS COMPANY, Appellee.**

No. 16286.

Court of Civil Appeals of Texas.

Fort Worth.

Feb. 2, 1962.

Rehearing Denied March 2, 1962.

Esir Tobolowsky, Dallas, for appellant.

Thompson, Knight, Wright & Simmons, Morris Harrell and David S. Kidder, Dallas, for appellee.

BOYD, Justice.

C. Walter Culkin sued Neiman-Marcus Company for $2,700.00 alleged to be owing as salary. From a judgment for Neiman-Marcus Company upon instructed verdict. Culkin appeals.

Appellant was the only witness, and he testified by deposition. According to his testimony, at the time the negotiations with appellee began, he had for twenty-six years been a hat salesman or manager of hat departments for concerns in New York City; in July, 1954, Edward Marcus, Vice President of appellee, contacted him and offered him a job. As a result of his being contacted by Marcus, appellant telephoned Art Fekety, appellee's buyer of men's furnishings at appellee's buying office in New York, and after several telephone conversations and one personal interview, "it was left that he would contact me."

On August 27, 1954, Fekety wrote the following letter to appellant:

"I have just finished discussing with our Personnel Director, Miss Mary Lloyd, the possibility of your coming down to work for us in our Men's Hat Department.

"When I saw you in New York I explained to you that when I came to Dallas, four and a half years ago, our previous year's hat business amounted to $80,000. and in the first year that I was here, just by virtue of having someone in the department who knew and understood the hat business, I built the volume up to $120,000.

"In the past four years our total man's business has increased considerably but since I have gotten out of the hat department the business has slipped back to where it was when I came here, simply because we have had no one in the department who has had the experience or the know-how. I can see no reason why someone like you couldn't come in and increase it to at least the same size as I did in that first year.

"All of the furnishings' men * * * of which there are eleven * * * are allowed to sell hats but I feel that out of the $120,000. someone who was in the department all the time would sell approximately $50,000. in a year. We pay 7% commission on hat sales which means that for sales of $50,000. one would make $3500. in a year's time. In addition to this, for the responsibility of keeping the department in shape, keeping stock records, reordering staples, assisting me in buying hats, and also assisting our furnishings' men in selling the

hats, we would be willing to pay you $300. per month. This would bring your total year's income up to $7100. This, of course, could be higher by an increased hat business and at the present time we feel that our hat department has a potential of $200,-000.

"The time will come, we feel sure, when the hat department will be moved to the third floor, clothing department. At the time this is done whoever is in charge of the department will, with one or two assistants, do all the hat selling. This, of course, would increase his commission.

"Should you decide to accept this offer we will allow you $600. toward your moving expenses.

"I hope that you will consider this offer favorably as I know you will be able to do the type job which will prove beneficial to both Neiman-Marcus Co. and yourself."

Appellant accepted the offer contained in the letter. At that time he was employed as a hat salesman by Brooks Brothers in New York. He gave up his job and his apartment and moved his family to Dallas, where he rented an apartment and had his furniture shipped and moved in. Appellee paid $600.00 on his moving expense. He reported for work on September 13, 1954, "the date specified by Mr. Fekety." After a two-week training period he performed the duties mentioned in Fekety's letter. He was paid $300.00 per month, in addition to seven per cent of his sales, until February 1, 1957. His earnings in 1955 were $7,988.00; in 1956, they were $8,435.00; in 1957 his earnings were $6,803.00 when for his non-selling duties he was paid only $150.00 per month for the last eleven months.

No one ever told appellant that his services were unsatisfactory. He never agreed to accept $150.00 per month instead of $300.00. He never agreed to any change in the original contract of employment. In January, 1957, he was called into the office of Miss Mary Lloyd, appellee's personnel director, and was informed by her that his non-selling salary would be reduced from $300.00 per month to $150.00 beginning February 1, 1957. Thereafter, he was paid, and accepted, $150.00 per month. He continued to perform the same duties as from the beginning. He testified: Q. "It is true, isn't it, that you did not make a claim upon Neiman-Marcus for back salary that you claim was owed you as a result of reduction of the non-selling salary from $300.00 to $150.00 per month until your resignation on July 30th, 1958?" A. "No; it is not true. I did not make a formal claim but I did object to Mr. Edward Marcus, Vice President, and he told me to sit tight and he would take care of it for me." Appellant voluntarily terminated his employment on July 30, 1958.

In response to a letter written to appellee by appellant's attorney on July 30, 1958, the response being signed by Norman W. Bramley, Vice President-Treasurer, appellee said: " * * * we are not aware of any liability to Mr. C. Walter Culkin. Our records indicate that Mr. Culkin resigned from our employ of his own accord, effective July 30, 1958, and all amounts due him were paid to that date. Neiman-Marcus Company does not make and never has made any contractual agreements with any of its employees or executives, and Mr. Culkin was no exception to this policy. * * *"

Appellant asks reversal on the ground that jury issues were raised. Appellee denied there was ever an enforceable contract for employment; but, if so, it contends: (1) the duration of the contract was at most from month to month; (2) appellant accepted a modification of the contract, reducing his non-selling salary; (3) appellant accepted "the terms of the contract of employment, effective February 1, 1957," whereby his non-selling salary was reduced; (4) appellant is estopped to deny that the contract was modified; and (5) he is estopped to deny that his original employment contract was terminated on January 31, 1957, and that he was

fully compensated under the terms of the contract effective February 1, 1957.

■ Although the case is not free from difficulty, we are of the opinion that it should have been submitted to the jury. Where the evidence is open to different material inferences a motion for instructed verdict may not be given. 41B Tex. Jur., p. 226, § 191.

■■ The rule is that, in the absence of special circumstances, a hiring at a stated sum per month is a definite employment for that period. Dallas Hotel Co. v. McCue, Tex.Civ.App., 25 S.W.2d 902. "But, if there be anything in the contract showing that the hiring was intended to be for a longer term, as for a year, the mere reservation of wages for a lesser term, as per week or month, will not control the hiring." Story on Contracts, 5th Ed., § 1291. We must seek the intention of the parties from a consideration of the agreement as a whole, in the light of all the circumstances, endeavoring to reach its real meaning, reconciling clauses apparently in conflict, if possible, to render the agreement fair, customary, and such as reasonable business men would execute. Stone v. Robinson, Tex.Civ.App., 180 S.W. 135, error refused. Selling a home, and removal of the employee and his family to the place of the new undertaking, has been usually deemed a factor of controlling weight. Dallas Hotel Co. v. Lackey, Tex. Civ.App., 203 S.W.2d 557; Putnam v. Producers' Live Stock Marketing Ass'n, 256 Ky. 196, 75 S.W.2d 1075, 100 A.L.R. 828; Dennis v. Thermoid Co., 128 N.J.L. 303, 25 A.2d 886.

In Smith v. Theobald, 86 Ky. 141, 5 S.W. 394, Theobald was offered a position as manager of a hotel and secretary and treasurer of the hotel company " 'in consideration of the salary of $125 per month, and rooms and board for yourself and family.' " The court said: " * * * we think that the facts set forth in the writing just quoted manifest a hiring by the year, * * * for it is shown by the letter that the ap-

pellee was in business in the city of Louisville as the manager of the Staniford Hotel; that he was required to give up that business and move himself and family to Hot Springs, Arkansas, and there assume the management of the Avenue Hotel, and to act as the secretary and treasurer of the hotel company. Was the appellee to give up his position in the Staniford Hotel in Louisville, and move himself and family to Hot Springs, Arkansas, a distance of several hundred miles, at a large expense to himself, for the sake of a month's employment at the price of $125 in the Avenue Hotel? We think that neither the appellant nor the appellee contemplated a contract of this kind. We think that the writing shows that they did not; but it shows that they contracted for a year's service at the rate of $125 per month, or $1,500 for the year."

" * * * of potent significance are the objects which the parties had in view, whether the purpose of the one was to secure a permanent employee who would develop his business in that particular service, and the purpose of the other was to obtain permanent employment." Putnam v. Producers' Live Stock Marketing Ass'n, 256 Ky. 196, 75 S.W.2d 1075.

■ We think at least it was a jury question as to the term of the hiring, particularly in view of statements in the letter from appellee's representative that "when I came to Dallas, four and a half years ago, our previous year's hat business amounted to $80,000. and in the first year that I was here, just by virtue of having someone in the department who knew and understood the hat business, I built the volume up to $120,000. * * * since I have gotten out of the hat department the business has slipped back to where it was when I came here, simply because we have had no one in the department who has had the experience or the know-how. I can see no reason why someone like you couldn't come in and increase it to at least the same size as I did in that first year." And again: "This would bring your total

year's income up to $7100. This, of course, could be higher by an increased hat business and at the present time we feel that our hat department has a potential of $200,-000. * * * I hope that you will consider this offer favorably as I know you will be able to do the type job which will prove beneficial to both Neiman-Marcus Co. and yourself."

 We cannot agree that the evidence conclusively shows that the parties made a new contract or modified the old one. Nor can we see any estoppel as a matter of law by reason of appellant's taking the $150.00 per month. He complained to Edward Marcus, a vice president of appellee, and the man who first contacted him about coming to Dallas and joining the firm, and "he told me to sit tight and he would take care of it for me." Appellee says that the evidence fails to show exactly what appellant said to Edward Marcus, or exactly what Marcus said to him; and it does not show Marcus' authority in the premises, "if in fact he made the statement at all." We may assume that the vice president, who first contacted appellant relative to working for the firm, had as much authority as its hat buyer or its personnel director. We cannot say that his intercession would not be within the apparent scope of his authority; and it was not conclusively shown that appellant did not have the right to believe or did not believe that the vice president could and would "take care of it" for him, after, in effect, advising him to continue on the job.

Another phase of the alleged estoppel is embodied in appellee's assertion in its brief that "*Because* of this conduct (continuing to work and receiving the $150.00 per month), *because* it deprived Appellee of the opportunity to discharge him, Appellant is estopped, as a matter of law, to deny such acceptance (the decision reducing his salary)." There is no allegation or proof that appellee ever wanted to discharge him, or was in anywise dissatisfied with his work. Indeed, his commissions for sales the first year were several hundred dollars more than the estimate contained in Fekety's letter, and they increased each year through 1957. With such a record, it does not strain credulity to assume that the vice president would "take care of it" for appellant if he would "sit tight."

The judgment is reversed and the cause remanded.